OPINION OF THE COURT
Fuchsberg, J.
The outcome of this appeal depends on whether certain tangible physical evidence and oral admissions should have been suppressed because the search and seizure of which they were products was conducted without a warrant.
George Hodge, the appellant here, stands convicted of manslaughter in the second degree. Though that judgment was entered upon his plea of guilty, pursuant to CPL 710.70 (subd 2) he nevertheless challenges the judgment of conviction as being founded upon the trial court’s erroneous prior refusal to suppress the articles and admissions in question.
*556 We first set forth the controlling facts. At about 6:00 a.m. on February 20, 1972, Police Officer Paul Ryan and his partner received a radio message dispatching them to 83rd Street and Columbus Avenue in Manhattan, where they were to learn that a fatal stabbing had occurred. Repairing to the scene posthaste, they observed upon their arrival a bloodstain in the snow outside a four-story rooming house along with an equally bloody trial on the steps leading into the building.
Ryan at once began ringing the building’s doorbell. Receiving no response, he proceeded to break a window in order to open the front door and thus gain admission to the common hallway. With fellow officers, he began an immediate floor-to-floor search, as a result of which further bloodstains were found on one of the intermediate staircases and in a bucket, a commode and a sink on the fourth floor community bathroom.
After this discovery, the officers knocked on the doors of the rooms located on that floor in order to speak to their occupants. One tenant informed the police that at about 5:30 a.m. she had heard sounds of an argument emanating from room 46. Another referred to the occupant of 46 as "the white man with blond hair”. This description tallied with that which the police had received of the victim when they first came to the scene, but the fact, unknown to the police, was that it fit both the dead man and his assailant.
In any event, Officer Ryan then rapped on the door of 46. When there was no reply, a key was obtained from the building superintendent and the officers, guns drawn as a precaution, entered the apartment, where they found Hodge in bed. As soon as he stood up and the officers observed he was in his underwear, they put their guns back into their holsters and proceeded to ask for his name and address. As they did so, they noticed a bloodstain on his right hand. Their inquiry as to its source elicited the explanation that Hodge had cut his foot. But the officers observed no sign of injury or any blood on that part of his body.
Appellant then agreed to go to the police station to assist in the investigation. While handing Hodge his jacket preparatory to their leaving the room, Ryan patted it, felt something hard, and recovered two knives, one of which appeared to have still more blood on it. Appellant admitted the knives were his. The sequence of these events was rapid. When the officers left with the appellant it was only 6:50 a.m.
It was thereafter, during the ride to the station house, that *557 Officer Ryan first gave the appellant the required warnings against self incrimination, whereupon Hodge agreed to answer questions in the absence of an attorney. The questioning that ensued became the basis for the prompt issuance of a warrant for a search of Hodge’s quarters, where a set of car keys fitting an automobile owned by the deceased was discovered. Several hours later, the appellant also made a separate inculpatory statement to an Assistant District Attorney.
It is clear that the trial court showed care in parsing out the components of appellant’s motions. It suppressed his admission of the ownership of the knives (because it had been elicited before the Miranda warnings were given) and the statement he made to the Assistant District Attorney (because the interrogation had proceeded before the summoning of a priest, as appellant had requested while failing, in answer to a question, to indicate an unequivocal willingness to be interviewed by the Assistant District Attorney without the presence of a lawyer). But, as to the knives, the car keys and the remaining statements, all of which the appellant contends were the fruit of the initial warrantless, and, therefore, in his view, illegal entry of his room, the motions were denied.
The Appellate Division, in affirming the judgment, upheld these rulings. On the analysis which follows, we too find that the refusal to suppress these evidentiary matters did not trespass on the appellant’s constitutional rights.
The motive force for the constitutional safeguards precluding unreasonable searches and seizures (NY Const, art I, § 12; US Const, 4th Arndt) is protection against arbitrary governmental invasion of privacy (see United States v Chadwick, 433 US 1, 11). To assure that, save for few specifically established and well-defined exceptions, the determination of whether the desire of the police to conduct a search or seizure is supported by probable cause is entrusted in the first instance to a neutral Magistrate. In the absence of "exigencies of the situation [that] made that course imperative” (McDonald v United States, 335 US 451, 456), all warrantless searches presumptively are unreasonable per se (Schneckloth v Bustamonte, 412 US 218, 219; Katz v United States, 389 US 347, 357). Where a warrant has not been obtained, it is the People who have the burden of overcoming that presumption.
In the present case, that burden was well met. Under the circumstances here, prudence obviously called for an immediate inquiry into the unsolved crime (People v Danziger, *558 41 NY2d 1092, 1094). The trappings of an emergency were self-evident. It would have been senseless for the police not to contemplate the likelihood that the fresh, bloody trail would lead to the perpetrator (Fellows v State, 13 Md App 206, cert den 264 Md 747; cf. Warden v Hayden, 387 US 294), or to the scene of the crime (United States v Keeble, 459 F2d 757, revd on other grounds 412 US 205), or to another person who was injured in whatever violence had occurred (People v Mitchell, 39 NY2d 173, cert den 426 US 953), or to the victim’s room (United States v Birrell, 470 F2d 113, 116-117).* That Officer Ryan’s personal opinion favored the existence of one of these alternatives does not eliminate the validity of the others. (Mascólo, The Emergency Doctrine Exception to the Warrant Requirement under the Fourth Amendment, 22 Buffalo L Rev 419, 426-427.)
Moreover, the exigent nature of the circumstances is supported by other factors. For instance, no one could mistake the utmost gravity of the crime under investigation, a violent taking of life. Also, that the perpetrator, if found, would probably be armed with at least a knife was a necessary inference from the stabbing. The bloody clues and the neighbor’s report of the quarrel at a time just before the stabbing almost inexorably linked any occupant of room 46 and the crime to one another. And, certainly, the brevity of the time lapses between the quarrel and the killing, and the killing and the police investigation, heightened the probability that a suspect might still be found on the premises (United States v Jarvis, 560 F2d 494, 498, cert den 435 US 934).
Nor can it be said, in the light of the rapidly unfolding facts that confronted the officers upon their arrival, that the manner of their investigation was unjustifiably intrusive (cf. Wayne v United States, 318 F2d 205, 212 [Burger, J.], cert den 375 US 860). By the time their attention was focused upon room 46, immediate entrance had become urgent (People v Vaccaro, 39 NY2d 468, 473). While according full weight to the relevant constitutional safeguards, to suggest in this framework that, once the door to the room had been opened, the police should have turned on their heels and left without at least asking some questions simply because the room’s occupant had been found in bed is to defy common sense *559 (State v Hardin, 90 Nev 10; Fellows v State, 13 Md App 206, cert den 264 Md 747, supra).
Finally, we note that, though it might have been possible to conclude, as appellant urges, that the information elicited from him was not sufficient to establish probable cause for his arrest — especially since the knives were not discovered until after he was asked to come down to the station house — we are faced with an affirmed finding of fact that he voluntarily consented to accompany the officers. Consent is a valid substitute for probable cause and, since there is support for the factual finding in this record, it is binding on our court (People v Morales, 42 NY2d 129, 137-138, cert den 434 US 1018).
Accordingly, the order of the Appellate Division should be affirmed.
Chief Judge Breitel and Judges Jasen, Gabrielli, Jones, Wachtler and Cooke concur.
Order affirmed.

 Of course, if the apartment had belonged to the deceased, a search warrant would have been unnecessary (United States v Birrell, supra).